### POWERS REGULATOR CO. v. NATIONAL REGULATOR CO.

(Circuit Court, N. D. Illinois, E. D. March 15, 1907.)

No. 26,777.

PATENTS—VALIDITY AND INFRINGEMENT—HEATING AND VENTILATING APPARATUS.

The Powers patent, No. 558,610, for improvements in heating and ventilating, which consist of a heating and ventilating apparatus wherein double dampers controlling separate ducts for hot and cold air are held in mixing position by a gradually-acting thermostatically-controlled motor, the purpose being to automatically regulate the temperature of the

air discharged into a room through a single pipe, was not anticipated and discloses invention, the device shown differing from anything in the prior art, in that the dampers are moved gradually, and not by steps from one fixed point to another; and in such respect the invention is so far a pioneer in its particular field as to entitle the patentee to claim the use of any of the well-known gradually acting thermostatic devices in the same combination as equivalents. As so construed, *held* infringed.

In Equity. On final rehearing.

Offield, Towle & Linthicum (Charles C. Linthicum, of counsel), for complainant.

Jones, Addington & Ames (W. Clyde Jones, Keene H. Addington, Robert Lewis Ames, and Arthur B. Seibold, of counsel), for defendant.

KOHLSAAT, Circuit Judge. Complainant files its bill to restrain infringement of claims 1, 2, and 3 of patent No. 558,610 granted to W. P. Powers on April 21, 1896, for improvements in heating and ventilating, and for other relief. The bill also included patent No. 722,251, granted to W. P. Powers on March 10, 1903, for an improvement in means for regulating temperature in connection with heating systems. The latter patent has been practically withdrawn, and no relief is now asked as to it, so that it will not be here considered. The claims in suit read as follows, viz.:

"(1) In an air-heating and ventilating system, separate ducts for currents of air at different temperatures, in combination with means for controlling the flow of the air-currents and a gradually-acting thermostatically-governed motor for controlling said means and operating to vary the position of the controlling means according to changes of temperature, substantially as described.

"(2) In an air-heating and ventilating system, separate ducts for currents of air at different temperatures, in combination with means for forcing the air, means for heating the current of air passing through one of the ducts, means for controlling the flow of the air-currents, and a gradually-acting thermostatically-governed motor for controlling said means, the construction of said duct-controlling means being such as to close one of the ducts in proportion to the extent to which the other is opened, whereby the air is directed proportionally through each of said ducts according to the variations of temperature in the apartments to be controlled, substantially as described.

"(3) In an air-heating and ventilating system, separate ducts for currents of air at different temperatures in combination with valves or dampers for controlling the ducts, a pneumatically-operated pressure device for controlling the valves or dampers and operating against a gradually-increasing resistance and a thermostat for maintaining the air-pressure proportionally to the temperature of the apartment to be controlled, substantially as described."

Defendant's device, which is not patented, relates to the same art, which art may be stated, in the language of the patent in suit, "to be a system of heating and ventilating by means of two currents of air at different temperatures, automatically mixed so as to maintain a uniform temperature in the apartment into which they are delivered; this delivery of the mixed air being made through a single pipe." It relates to means for heating and ventilating apartment buildings, schoolhouses, and other edifices containing a number of rooms, from a single plant. Both devices show "a heating and ventilating apparatus wherein double dampers, controlling separate ducts for hot and cold air, are held in mixing position by a gradually-acting thermostatically-controlled motor." The difference claimed by the defendant

between the two consists in the character of the "gradually-acting devices" and in the form of the dampers. Complainant's counsel summarizes its position in the sentence: "No one before Powers arranged a gradually-acting thermostat with double dampers, so as to hold them in mixing positions."

It is conceded by complainant that the specific form of thermostat shown in the patent is old; that dampers which "move throughout their whole range of movement, when once set in motion, whereby alternate discharges of hot and cold air into the room were effected automatically," were old; and that manually operated dampers, whereby separate currents of hot and cold air were mixed before delivery into the apartment, were also old. The gist of the invention claimed is the attainment of this last result automatically.

The patent calls for a thermostatic device working in connection with a fluid column, a mercury chamber, a second chamber in communication with the mercury chamber, which second chamber contains a float, the movements of which are made to operate the dampers. The air-column is compressed and made to act upon the mercury within the mercury chamber by the movement of a flexible diaphragm which divides the thermostat into two chambers. The same thermostatic device, the specification recites, "is clearly shown and described in Patent No. 416,947, granted to me December 10, 1889." The patentee says he employs the above-described form of thermostat, preferably, and adds:

"But a different form of thermostat may be used for maintaining a fluid pressure proportional to the temperature, and, instead of the mercury device, any other suitable fluid pressure motor may be used for moving the dampers."

The patentee, as a witness, testifies that:

"The patent in suit describes only a typical arrangement where all the parts are of the simplest possible form, thus making clear the essential elements of the combination, viz., a direct acting thermostat."

It will be seen that the thermostat of the patent acts as the engine furnishing power to the motor. The two dampers of the patent controlling the two, i. e., the hot and cold air passages, are preferably mounted separately and adjustably connected by a rigid arm. The same result, it is alleged in the specification, may be attained by the proper arrangement of a single damper. The dampers are set obliquely to the walls of the ducts, and the planes of the frames of the dampers intersect each other at substantially right angles. "The object of placing the dampers at oblique angles with reference to the line of the ducts," it is explained, "is to secure quicker action when either damper opens or closes, and to secure the full action of said dampers with the shortest movement—such movement being one-eighth of a revolution, when the damper frame is placed at an angle of 45 degrees to the longitudinal axis of the duct line; while if the damper were set at right angles to such axis, as in the common manner, a full quarter turn would be required to secure the same opening. This feature is highly important, where, as in my present improvements, it is desired to secure the full range of movement of the dampers with a slight action of the thermostat and pressure device controlled thereby." The

dampers are so placed with reference to each other that they present at all times the same amount of opening for the admission of air, i. e., when the hot air duct is open the cold duct will be closed, and vice versa, and any variation of one damper from its closed position effects a corresponding adjustment of the other damper. Some attempt is made by the defendant to show that complainant's device requires the oblique-set dampers to make it operative. That the old right-angle dampers require more power than those of the patent seems to be conceded; but, inasmuch as the question is only one of degree of power, there can hardly be claimed to be any difference between the two in principle. The specifications close with the following clause:

. "It is obvious that the construction and arrangement of parts herein shown and described may be varied as to details, and that my invention may be embodied in heating and ventilating systems widely varying as to such structural details from the form herein presented."

Defendant's construction employs a thermostatic device which operates to release a column of compressed air, which in turn operates the motor in connection with a right-angle damper. Neither of them is new. As above stated, the only reason why the patent in suit employs obliquely set dampers is that of greater efficiency. Any damper can be successfully operated by the device of the patent. There remains, then, only to inquire whether, in view of the prior art, complainant is limited to the particular means described in the patent for securing gradual opening and closing of the dampers.

From the domain of the prior art, defendant, by its answer, summons to its aid more than three score patents, and also recites a like number of prior uses and two prior publications. Very considerately, only 54 patents were introduced in evidence. The great bulk of these cover minor parts employed in heating systems, so that defendant's expert was able to select five patents as most nearly anticipating the patent in suit. These are patents: (1) No. 543,929, granted to S. A. Ekehorn, on August 6, 1895; (2) No. 544,015, granted to Underhill & Glantzberg, on August 6, 1895; (3) No. 236,520, granted to Westinghouse, Jr., on January 11, 1881; (4) No. 412,280, granted October 8, 1889, to Merrill; and (5) No. 416,947, granted to W. P. Powers, on December 10, 1889—all issued for improvements in automatic regulation of valves or dampers. Of these the Ekehorn and Underhill & Glantzberg patents are selected by defendant as meeting the terms of claims 1 and 2 in suit, while the others are introduced with reference to claim 3. The Ekehorn patent relates to an electric temperature-controlling device, used in connection with a thermostat, wherein the thermostat, located in the chamber in which the temperature is to be regulated, sets in operation an electric motor which is adapted to open and close the valve or damper, thus substituting electricity for compressed air of defendant's structure.

The patentee says he provides, among other things, for:

"A hot air heating system in which the air-supply pipe leading to the chamber communicates with both a hot air and a cool air supply, the motor operating to turn both valves or dampers between the air pipe and both the said supplies simultaneously, whereby the air flowing through the pipe to the chamber may be properly tempered without varying its volume."

The dampers in this device are made to move over a definite space or from one definite position to another, so that the dampers move by jerks. They must pass clear through the spaces between these definite positions without stopping. They approximate the action of the patent in suit just to the extent that the graded spaces are less than the whole sweep of the dampers. Conceivably, the spaces might be made so short that the action might become to all intents and purposes, at least theoretically, gradual, as in the patent before the court. On the other hand, the delays of the needle upon the thermostatic bar at the contacts or stops may become so prolonged as to make the movements somewhat unresponsive and inexact. The patent makes these spaces cover 45 degrees each, but says the device may be adapted to an increase or decrease of contacts. The movements of the dampers are graded, but not gradual. The idea of a readily responsive swinging obedience at all points of the half circle of movement, and at all times to the indications of the thermostat, is wanting. The operating element is electricity; whereas, the patent and alleged infringing device deal with pneumatic operations of the motor. However, if that were the only difference, it would seem as though, in considering claims involving the securing of gradual movement in the regulation of dampers, as an original question the freeing of compressed air and the closing of an electric current to do the same work would be practical equivalents.

The Ekehorn patent was pending in the Patent Office when the patent in suit was applied for. The construction thus impliedly given to the patent in suit by the examiner, as well as counsel for Ekehorn, is of weight in determining the scope of the two patents.

The Underhill & Glantzberg patent "is designed to obviate the constant fluctuation in temperature, and to this end it consists in causing the movement of the valve, damper or other controlling device to take place gradually, a little by little, opening or closing only so much as may be necessary to bring the temperature to the required degree and there leaving it at rest." Specification, p. 1, lines 59–66. This device, like the foregoing, includes the employment of a thermostat to set in motion an electric current as the motive force in adjusting dampers and valves. The circuit is momentarily closed at stated intervals, whereby, in connection with appropriate assisting media, the damper is moved "one short step in the range of its movements." It differs from the Ekehorn patent in the method of operation, rather than in the results attained. It nowhere discloses the free swinging of the dampers without periodical dead stops, over the whole range thereof, at the slightest suggestion of the thermostat. It is jerky and positive in the movements, and sweeps abruptly from one contact to another. It has no gradual movement across the space between the stops. When the thermostat makes contact with either of its stops during closure of the circuit, the circuit will be completed long enough to momentarily withdraw a detent and permit a weight motor or other device to move the valve or damper as above stated one short step in the range of its movement. Lines 74 to 78, p. 1, Specification. These

steps are referred to in lines 113 to 117, p. 3, Specification, as follows, viz.:

"It will be found convenient also to have contact made by the periodic circuit closer at intervals of about ten minutes, though the length of these intervals may be made greater or less, as deemed expedient."

There are no steps in complainant's device.

A further defense to the claim of defendant that these two last-named patents anticipate the patent in suit is found in the fact that the date of the invention of the latter is fairly established by the record to have been prior to the date of the invention by them set out.

The Merrill patent presents a device for regulating heat by regulating the supply of fuel gas, though the patentee claims it may be applied "wholly or in part to heaters of different kinds." The apparatus acts "solely by the pressure of the fluid force, without other agency—such as compressed air or electricity—to economize the fuel and to insure steadiness and uniformity in its supply. To accomplish this latter object requires apparatus which responds almost instantly to slight fluctuations in temperature, so that the changes in pressure, in the main, are slight and gradual, and not suddenly changed from one extreme to the other." Specification, p. 1, lines 24–29. The device is, as complainant's expert, Carter, says (page 59, C. R.), "undoubtedly gradually operating." It is confined, however, to the control of fuel supply, and does not cover complainant's combination.

The Westinghouse patent, No. 236,520, covers heating and generating devices, automatically set in motion by the temperature of the room to be heated, acting upon the thermostat. It was among the first, if not itself the pioneer, in attempting to accomplish that end. It seems to be gradually acting, though no mention is made of that feature, nor of the resistance spring. The patentee makes use of water under pressure in operating his motor primarily, but says steam and compressed air may be substituted. The movements of the piston vary the position of the damper or valve, register or other device, "so as correspondingly to lessen the heat-generating or heat-delivery power or capacity of the heating apparatus; and by a still further connection of like character, the same motion may be employed to open ventilating flues or openings for the admission of cold air." Specification, p. 2, lines 41–47. At the date of this invention, present methods of heating were not in use. Even had they been, it seems doubtful, from the opinion of complainant's expert, whether this device could have been adapted to the manipulation of the hot and cold air ducts and their double dampers of the patent in suit. At any rate, it was not so applied until after complainant blazed the way. Assuming that it could have been so adjusted, there yet remained the adaptation to modern heating methods, and especially to the double ducts and dampers for simultaneous admission and mixing of hot and cold air before delivery to the apartment. From the year 1881 to 1896, the device was before the public, but seems to have suggested nothing practicable in the heating and ventilating art.

Of the five patents alleged to more closely anticipate the patent in suit, there yet remains to be considered the Powers patent, num-

bered 416,947, issued December 10, 1889. The patentee claims to have invented certain new and useful improvements in thermostats, with the object of automatically controlling the temperature of various rooms in a building. The thermostat of the patent in suit is practically that of this patent. "It is obvious," says the specification, "that this device may be applied to open or close a transom or operate other ventilators; the only change necessary to adapt it to operate a transom being to connect the lever, R, with the operating rod of the transom." The patent does not disclose the two hot and cold air ducts, or the double dampers, or the other means for heating the air of one of them, or for forcing the air through them, or any mixing means so as to proportion the two currents to the demands of the space to be heated; nor does it show any pneumatically-operated pressure device, "operating against a gradually increasing resistance," although the patentee, upon the stand, speaks of "the gradual-action thermostat of patent No. 416,947," and adds: "This was the only gradually acting thermostat on the market at that time." In May, 1892, he writes: "* * * It will keep the damper at such a position as will deliver a mixed current of air of the proper temperature to give the desired result." Defendant asserts that this increasing resistance is supplied in the 1889 Powers patent by the resiliency of the motor and the thermostat diaphragms. The difference between the two devices does not consist in the working apparatus of the thermostatic element, but in the whole combination.

A general inspection of the other patents in the prior art, disclosed in the record, justifies the defendant's expert in selecting the foregoing five patents as fairly expressing the condition of the art at the date of the patent in suit. The attempt to establish prior use and publication cannot be said to be satisfactory. It lacks the certainty which is required in such a case. The burden was on defendant, and it has not been sustained. As a result of the comparison with the prior art, it is evident that the invention of the patent in suit must be limited to double dampers, controlling separate ducts for hot and cold air, held in mixing position by a gradually-acting thermostatically-controlled motor. This combination is nowhere previously shown. The general principles governing the operation do appear, and it had been theretofore stated in general terms that gradually-acting thermostatic devices might be applied to other uses than those described in the prior patents, but it had never been done, notwithstanding the demand for improvements in the art had been great. Prof. Johnson, one of the leading inventors in the heating and ventilating arts, insisted that such a device could not be made practical. It is shown by the record that the patent in suit does accomplish this supposed impossible result. The device has gone into such general use that government specifications provide that: "The temperature of the air delivered into the building by the fan is to be regulated by means of the Powers or equal system of automatic temperature control." With some modifications, which do not affect the patentable features of the patent in suit, it appears to

have gone into very general use in public school buildings in the large cities of the United States./

In view of what has been said, the patent must be held valid, and so far a pioneer in its particular line as to entitle complainant to claim the use of any of the well-known gradually-acting thermostatic devices in the same combinations, as equivalents. The form of the dampers is unimportant, so long as they are adapted to close one of the ducts in proportion to the extent to which the other is opened, in response to gradual thermostatic action. If this be true, then defendant's device must be and is held to infringe each of the claims in suit construed in connection with the drawings and specifications.

Complainant may prepare a decree accordingly.